1   DAYLE ELIESON
    United States Attorney
2   JAMES E. KELLER (NVBN 10636)
    Assistant United States Attorney
3   United States Attorney's Office
    400 So. Virginia Street, Suite 900
4   Reno, NV 89501
    James.Keller3@usdoj.gov
5   Attorneys for United States of America

**SEALED** FILED

**JUN 13 2018**

U.S. MAGISTRATE JUDGE
DISTRICT OF NEVADA
BY_____DEPUTY

6               **UNITED STATES DISTRICT COURT**

7                   **DISTRICT OF NEVADA**

8   UNITED STATES OF AMERICA,              No. 3:18-mj-0102-VPC

9               Plaintiff,                 **COMPLAINT FOR VIOLATIONS OF:**

10      v.                                 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii) –
                                           Distribution of at least 50 Grams of Actual
11  Jose Valentin MORA, a/k/a Cholo, a/k/a Magic,   Methamphetamine (Count One)
    Sandy Diaz TAVARES,
12  Jose VEGA, a/k/a Panda,                21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii) –
    Angel DIAZ,                            Distribution of at least 50 Grams of a Mixture
13  Javier CHAVEZ,                         and Substance Containing a Detectable Amount
    Shawn CURL,                            of Methamphetamine (Counts Two to Four)
14  Marcos HERNANDEZ a/k/a Bigotes,
    Roberto MORA-Mora,                     21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), 846
15  Juan BACA, a/k/a Sneaky,               Conspiracy to Distribute and Possess with
    Nyra Navarro-ORTIZ, a/k/a Chavela,     Intent to Distribute (i) at least 500 grams of a
16  Richard ROSSALL, a/k/a Monopoly,       mixture and substance containing a detectable
    Ciara HERNANDEZ, and                   amount of methamphetamine, (ii) a mixture and
17  Marco Antonio RAMIREZ, a/k/a Anthony,  substance containing a detectable amount of
                                           cocaine, and (iii) a mixture and substance
18          Defendants.                    containing a detectable amount of heroin,
                                           in violation of 21 U.S.C. §§ 841(a)(1),
19                                         841(b)(1)(A)(viii), 841(b)(1)(B)(C), and 846
                                           (Count Five)
20
                                           21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii) –
21                                         Possession with Intent to Distribute at least
                                           500 Grams of a Mixture and Substance
22                                         Containing a Detectable Amount of
                                           Methamphetamine (Count Six)
23
                                           18 U.S.C. § 2 – Aiding and Abetting (Counts
24                                         One, Two, Three, Four, and Six)

1

1    Before the Honorable Valerie P. Cooke, United States Magistrate Judge, Reno, Nevada, the

2    complainant, being first duly sworn, states in the attached affidavit in support of the following charges:

3                                            **Count One**
Distribution of at least 50 Grams of Actual Methamphetamine –
4                            21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii)

5    On or about January 25, 2018, in the District of Nevada,

6                            JOSE MORA, a/k/a Cholo, a/k/a Magic,

7    defendant herein, knowingly and intentionally distributed at least 50 grams of actual methamphetamine,

8    a schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii); and 18

9    U.S.C. § 2.

10                                           **Count Two**
Distribution of at least 50 Grams of a Mixture and Substance
11                    Containing a Detectable Amount of Methamphetamine –
21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii)
12

13    On or about February 20, 2018, in the District of Nevada,

14                            JOSE MORA, a/k/a Cholo, a/k/a Magic,

15    defendant herein, knowingly and intentionally distributed at least 50 grams of a mixture and substance

16    containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of

17    21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii); and 18 U.S.C. § 2.

18                                          **Count Three**
Distribution of at least 50 Grams of a Mixture and Substance
19                    Containing a Detectable Amount of Methamphetamine –
21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii)
20

21    On or about April 20, 2018, in the District of Nevada,

22                            JOSE MORA, a/k/a Cholo, a/k/a Magic,

23

24

defendant herein, knowingly and intentionally distributed at least 50 grams of a mixture and substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii); and 18 U.S.C. § 2.

### Count Four
Distribution of at least 50 Grams of a Mixture and Substance
Containing a Detectable Amount of Methamphetamine –
21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii)

On or about April 30, 2018, in the District of Nevada,

JOSE VEGA, a/k/a Panda,

defendant herein, knowingly and intentionally distributed at least 50 grams of a mixture and substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii); and 18 U.S.C. § 2.

### Count Five
Conspiracy to Distribute and Possess with Intent to Distribute
(i) at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine,
(ii) a mixture and substance containing a detectable amount of cocaine, and
(iii) a mixture and substance containing a detectable amount of heroin,
in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), 841(b)(1)(B)(C), and 846

Beginning at an unknown date, but no later than on or about April 2, 2018, and continuing to at least May 30, 2018, in the District of Nevada, and elsewhere,

Jose MORA, a/k/a Cholo, a/k/a Magic,
Sandy Diaz TAVARES,
Jose VEGA, a/k/a Panda,
Angel DIAZ,
Javier CHAVEZ,
Sean CURL,
Marcos HERNANDEZ a/k/a Bigotes,
Roberto MORA-MORA,
Juan BACA, a/k/a Sneaky,
Nyra Navarro-ORTIZ, a/k/a Chavela,
Richard ROSSALL, a/k/a Monopoly,
Ciara HERNANDEZ, and
Marco Antonio RAMIREZ, a/k/a Anthony,

defendants herein, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other, and with other persons known and unknown, to distribute and possess with intent to distribute:

    (i)    at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846;

    (ii)    a mixture and substance containing a detectable amount of cocaine, a schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; and

    (iii)    a mixture and substance containing a detectable amount of heroin, a schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846.

**Count Six**
Possession with Intent to Distribute at least 500 Grams of a Mixture and Substance Containing a Detectable Amount of Methamphetamine –
21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii)

On or about May 28, 2018, in the District of Nevada,

Jose MORA, a/k/a Cholo, a/k/a Magic,
Marcos HERNANDEZ a/k/a Bigotes, and
Ciara HERNANDEZ,

defendants herein, knowingly and intentionally possessed with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii); and 18 U.S.C. § 2.

## <u>AFFIDAVIT IN SUPPORT OF APPLICATION</u>

I, Scott Dunn, being duly sworn under penalty of perjury, depose and state that:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed for 14 years. I am currently assigned to the FBI, Reno Resident Agency. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516.

### I.

### <u>TRAINING AND EXPERIENCE</u>

2. I was hired by the FBI in June, 2004, and attended the FBI Academy in Quantico, Virginia from June 2004 to September 2004. I was trained in all aspects of drug investigations, including, but not limited to, interviews and interrogations, conspiracy and complex investigations, search and seizure, financial investigations, drug interdiction, evidence handling, surveillance operations, informant management, violent gang investigations, as well as numerous hours of firearms and tactical operations training.

3. Since starting my employment with the FBI, I have personally assisted with the execution of numerous state and federal search warrants and arrests. In the course of my work with the FBI, I am familiar with the operating methods of drug traffickers, including the distribution, storage, and transportation of drugs. I have conducted investigations regarding the unlawful possession with intent to distribute and distribution of controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 841(b), the importation of controlled substances, in violation of 21 U.S.C. §§ 952 and 960, conspiracy to commit the foregoing offenses, under 21 U.S.C. § 846, and firearms trafficking and possession of firearms by prohibited persons, in violation of 18 U.S.C. §§ 922 and 924.

4. In my work as a Special Agent for the FBI, I have personally conducted investigations of individuals who have violated state and federal drug and firearms laws. I have also worked in the company of other experienced law enforcement officers and have discussed their investigative techniques and their investigative experiences with them. I have had numerous contacts with other agents and police officers concerning the methods used by persons dealing in controlled substances. This experience includes contacts with people associated with the illegal trafficking of controlled substances and firearms and their methods used in obtaining, storing, manufacturing, transporting, and distributing illegal narcotics and firearms as well as their record keeping practices in concealment of the proceeds derived from the sale of controlled substances, and their typical use of coded language when discussing drug and/or firearms trafficking over cell phones.

## II.

## **PURPOSE OF AFFIDAVIT**

5. This affidavit is submitted for the limited purpose of obtaining arrest warrants for each of the following individuals:

1) Jose Valentin MORA, a/k/a Cholo, a/k/a Magic,
2) Sandy Diaz TAVARES,
3) Jose VEGA, a/k/a Panda,
4) Angel DIAZ,
5) Javier CHAVEZ,
6) Shawn CURL,
7) Marcos HERNANDEZ a/k/a Bigotes,
8) Roberto MORA-Mora,
9) Juan BACA, a/k/a Sneaky,
10) Nyra Navarro-ORTIZ, a/k/a Chavela,
11) Richard ROSSALL, a/k/a Monopoly,
12) Ciara HERNANDEZ, and
13) Marco Antonio RAMIREZ, a/k/a Anthony,

(hereinafter, collectively referred to as the "Defendants"),

2

for one or more offenses involving the distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), 841(b)(1)(B)(viii), and 841(b)(1)(C), and conspiracy to distribute and possess with intent to distribute controlled substances, to wit: at least 500 grams of a mixture and substance containing a detectable amount methamphetamine, a mixture and substance containing a detectable amount of cocaine, and a mixture and substance containing a detectable amount of heroin, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(viii), 841(b)(1)(C), and 846 (hereinafter, collectively referred to as the "Target Offenses").

### III.

### BASIS OF INFORMATION

6. I make this affidavit based upon personal knowledge derived from my participation in this investigation, and upon information I believe to be reliable, which includes but is not limited to the following:

    a.  my experience investigating persons and organizations engaged in the possession with intent to distribute, manufacture, transportation/smuggling, and distribution of controlled substances;

    b.  oral and written reports, and documents regarding this investigation that I have received from members of the FBI, local law enforcement agencies, and other federal law enforcement agencies;

    c.  discussions I have had personally concerning this investigation with other experienced drug trafficking investigators;

d. physical surveillance conducted by the FBI and other state and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

e. information from an FBI confidential human source (hereinafter, the "CHS"),[1] recordings of cell phone communications involving CHS and defendants MORA and VEGA, and recorded events involving CHS and MORA and VEGA.

f. intercepted communications over two cell phones, the first one assigned call number (775) 527-6931 and thereafter assigned call number (775) 221-2180, and the second one assigned call number (775) 379-4034 and thereafter assigned call number (775) 221-2176, each believed to be used by Jose Valentin MORA, as authorized by Court Order in matter numbers CCA-N-2018-002-HDM and CCA-N-2018-003-HDM (each under seal), respectively.

7. Because this affidavit is submitted for the limited purpose of demonstrating probable cause for the issuance of arrest warrants for the Defendants, I have not set forth every fact resulting from the investigation or every aspect of this investigation. Rather, I have set forth a summary of the facts I have learned about the investigation to date to establish probable cause for the issuance of arrest warrants for each of the Defendants for the Target Offenses as defined herein. Times referenced below are meant to be approximate, and, unless appearing

---

[1] CHS is a paid informant. FBI has been paid a total of $7,000 to CHS in relation to CHS's assistance in this investigation. Information CHS has provided has been deemed reliable and has been independently corroborated through review of telephone records, physical surveillance, and information provided by other sources unknown to CHS, and by other methods. According to NCIC records, CHS has a criminal history of misdemeanor Domestic Battery from January 2016 and November 2015. In October 2014, CHS was charged and pled guilty to misdemeanor Destroy Property of Another. In November 2017, CHS was arrested for misdemeanor Domestic Battery and misdemeanor Contribute to Delinquency of Minor. In February 2012, CHS was arrested for misdemeanor Domestic Battery. In November of 2009, CHS was arrested for Possession of a Stolen Vehicle. In 2004 and 2005, CHS was arrested for Family Abuse.

in quotations, reference to communications below are not meant to be a verbatim recitation

of the communications.  Sometimes punctuation, such as a period or question mark, has been

added to the end of intercepted text messages referenced below for clarity purposes.

Furthermore, to be grammatically correct, those punctuation marks appear inside of the

quotation marks even though the intercepted text message typically contained no such

punctuation.

## IV.

## BACKGROUND OF INVESTIGATION

8. The FBI Reno Safe Streets Task Force has been investigating a drug trafficking organization

("DTO") that is believed to be distributing methamphetamine, cocaine, and heroin in the

greater Reno, District of Nevada area.  The investigation was initiated in January 2018.

MORA is believed to be the leader of the DTO.

9. A number of Court orders were obtained in the investigation.  One of them was issued on

April 2, 2018 ("April 2 Order"), by Hon. Howard D. McKibben, United States District Judge

for the District of Nevada, in CCA-N-2018-002-HDM (under seal), authorizing the

interception of wire and electronic communications over Target Telephone 1 (or "TT-1"), a

cell phone believed to be used by MORA assigned call number (775) 527-6931, which

thereafter was assigned call number (775) 221-2180.  Pursuant to the April 2 Order,

interception of wire and electronic communications over TT-1 commenced on April 2, 2018.

10. On April 30, 2018, Hon. Howard D. McKibben issued an Order ("April 30 Order") in CCA-

N-2018-002-HDM and CCA-N-2018-003-HDM (each under seal), authorizing the continued

interception of wire and electronic communications over TT-1, and authorizing, respectively,

the interception of wire and electronic communications over Target Telephone 2 (or "TT-2"),

a second cell phone believed to be used by MORA assigned call number (775) 379-4034, and

thereafter assigned call number (775) 221-2176. Interceptions of wire and electronic communications over TT-1 continued on April 30, 2018, and interception of wire and electronic communications over TT-2 began after the April 30 Order was signed. References to some of the intercepted communications over TT-1 and TT-2 appear below, a majority of which were in the Spanish language, and, if in Spanish, appear here in English as translated. Because the purpose here is to demonstrate the commission of one or more of the Target Offenses by Defendant under a standard of probable cause for the crimes alleged herein, not all or even most of the intercepted communications are referenced herein. Rather, this affidavit contains examples and summaries of intercepted communications over TT-1 and TT-2 which demonstrate probable cause of the violation of one or more of the Target Offenses by each of the Defendants. In addition, because this affidavit is only to demonstrate probable cause for the issuance of arrest warrants, it does not contain every fact known to investigators nor nearly every intercepted communication over TT-1 and or TT-2.

11. The following investigative information contains the facts in support of the complaint charging Defendants with one or more of the Target Offenses in the District of Nevada, and elsewhere, warranting the issuance of an arrest warrant for each of the Defendants.

## V.

## PROBABLE CAUSE STATEMENT

### *Count 1*

***Distribution of at least 50 grams of actual methamphetamine on or about January 25, 2018,
in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii)***

### *as to Defendant Jose MORA*

12. On January 23, 2018, at the direction of FBI investigators, an FBI confidential source (identified herein as the "CHS") sent several text messages to Jose MORA, who was using TT-1. Investigators confirmed the text messages between CHS and TT-1 by reviewing the text message history between CHS and TT-1 on CHS's cellular telephone, and CHS provided screen shots of the below text messages to investigators. CHS wrote, "Ok, I forgot to get the price for the same before." [Here, CHS was referring to the price of one pound of methamphetamine.] MORA responded from TT-1 a short time later, writing, "For what?" CHS responded, "Wat Panda got the first time." [CHS referred to the one pound of methamphetamine that Jose VEGA, a/k/a Panda, had purchased from MORA previously.] MORA wrote back, "$3,000. Each." [MORA advised that the price of one pound of methamphetamine is $3,000 for one pound.] CHS later wrote to TT-1, "Ok bro I will be able to do it by Thursday...." MORA responded, "Ok, Just let me know."

13. On January 24, 2018, CHS sent a text message to MORA at TT-1 writing, "Hey bro I will be able to do it by tomorrow are u available." MORA responded using TT-1 asking, "A whole one?" Based upon my training and experience and familiarity with this investigation, the term "whole one" referred here to one pound of methamphetamine.

14. On January 25, 2018, CHS, using CHS's cell phone, and MORA, using TT-1, exchanged several more text messages to coordinate the location for the methamphetamine transaction on January 25, 2018. Investigators confirmed the foregoing text messages between CHS and

7

TT-1 by reviewing the text message history between CHS and TT-1 on CHS's cell phone, and CHS provided screen shots of the below text messages to investigators.

15. At approximately 6:16 p.m., on January 25, 2018, MORA called CHS using TT-1, a call that was monitored by me. In that call, MORA agreed to meet CHS at the Nugget Casino in Sparks, Nevada, to conduct the methamphetamine transaction. In a subsequent call from TT-1, also monitored by me, MORA informed CHS that he was parked in the corner parking lot by Victorian Avenue and Victorian Plaza, next to the Nugget Casino. CHS agreed to go meet MORA in the parking lot to conduct the methamphetamine transaction.

16. Investigators searched the CHS prior to CHS's arranged meeting with MORA, finding no contraband. CHS was provided FBI official funds for the anticipated methamphetamine transaction and fitted with a recording device. Investigators conducted surveillance on CHS and observed CHS meet with MORA at the northeast entrance to the Nugget Casino. CHS and MORA walked to the parking lot located to the northeast of the Nugget Casino. MORA got into the driver's seat of a black Dodge Charger, and CHS got into the front passenger seat of that vehicle. Investigators then observed MORA exit the vehicle and crouch down by the driver's side front wheel well for approximately five seconds. MORA then got back into the driver's seat of the vehicle. CHS reported that MORA had put on a glove and retrieved one pound of methamphetamine from the front driver's side wheel well of the Dodge Charger. During this meeting, CHS purchased one pound of methamphetamine from MORA in exchange for $3,000 of FBI pre-recorded funds. Immediately after the transaction with MORA, CHS returned directly to the pre-determined meet location with investigators and provided agents the methamphetamine purchased from MORA. Investigators conducted a search of CHS, revealing no contraband other that the pound of methamphetamine purchased.

17. The pound of suspected methamphetamine was processed as evidence and found to weigh approximately 491.9 gross grams. The substance was later submitted to the DEA Southwest Laboratory for analysis; the results revealed 368 grams of actual or pure methamphetamine. The foregoing controlled purchase of methamphetamine from MORA was audio and video recorded.

### Count 2

***Distribution of at least 50 grams of a mixture and substance containing a detectable amount methamphetamine on or about February 20, 2018, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii)***

#### as to Defendant Jose MORA

18. On February 20, 2018, at the direction of FBI investigators, CHS sent several text messages to MORA who was using TT-1 in order to coordinate a controlled purchase of methamphetamine. Investigators confirmed these text messages between CHS and TT-1 by reviewing the text message history between CHS and TT-1 on CHS's cellular telephone. CHS provided screen shots of the below text messages to investigators. CHS wrote that CHS was "needing something."

19. Based upon my training and experience and familiarity with this investigation, the term "needing something" used by CHS here refers to needing a supply of methamphetamine. MORA responded from TT-1, "How much?" CHS replied, "I have a G on me......" [Here, based upon my training and experience and the dialogue already in existence between CHS and MORA, "G" refers to $1,000.] MORA wrote back, "Ok, Let me know when your ready." CHS replied, "Could you do a qtr for a G." Based upon my training and experience, CHS here asked MORA if he was willing to sell a quarter pound of methamphetamine to CHS in exchange for $1,000. MORA responded on TT-1, "Yeah I can do that." CHS continued to communicate with MORA on TT-1 via text messages. MORA and CHS agreed

9

to meet at the Popeye's restaurant (hereinafter "Popeye's") at 3600 South Virginia Street, Reno, Nevada. MORA sent CHS a text message from TT-1, "I still got a go home and getting it." Based upon my training and experience and familiarity of this investigation, and this text message in context of the overall communications, I believe MORA informed the CHS that he needed to go home first to pick up the four ounces of methamphetamine.

20. In the later afternoon of February 20, 2018, investigators searched the CHS prior to CHS's arranged meeting with MORA at Popeye's, finding no contraband. CHS was provided FBI official funds for the anticipated methamphetamine transaction and fitted with a recording device. At approximately 5:30 p.m. that evening, CHS received a call from TT-1. Investigators were in the presence of CHS when this call was received. Investigators confirmed the call from TT-1 by reviewing the call history on CHS's telephone. This call was not recorded due to technical difficulties recording incoming calls. In this call, MORA asked CHS if CHS was still at Popeye's. CHS confirmed to MORA (using TT-1) that he/she (CHS) was at Popeye's. Approximately two minutes later, investigators observed MORA exit his residence/trailer at 2725 Kietzke Lane, Reno, Nevada, and drive directly to Popeye's. Investigators observed MORA park to the south of Popeye's and exit a black Dodge Charger. MORA opened the hood of the black Dodge Charger and retrieved a white package from the engine compartment on the passenger side. MORA then closed the hood and got back into the black Dodge Charger, and drove the black Dodge Charger closer to the south side of the Popeye's restaurant.

21. CHS exited the restaurant (Popeye's) and got in the front passenger seat of MORA's black Dodge Charger. MORA then reached to his left jacket pocket and provided an item to CHS. The CHS purchased approximately four ounces of methamphetamine (which is a quarter pound) from MORA in exchange for $1,000 pre-recorded FBI funds. CHS exited the vehicle

10

and returned to Popeye's until MORA left the area. CHS then walked directly to the pre-determined meet location with investigators where CHS relinquished custody of the four ounces of methamphetamine to investigators. Investigators conducted a search of CHS, revealing no other contraband than the four ounces purchased.

22. The drug evidence was processed as evidence and found to weigh approximately 142 grams (gross weight). The substance was later submitted to FBI Evidence in Las Vegas, Nevada, pending shipment to the DEA Southwest Laboratory for analysis and safekeeping. On March 26, 2018, FBI agents in Las Vegas conducted a field-test of the above described suspected methamphetamine purchased from MORA on February 20, 2018, which resulted in a positive determination for the presence of methamphetamine. This methamphetamine transaction was audio and video recorded.

### *Count 3*

***Distribution of at least 50 grams of a mixture and substance containing
a detectable amount of methamphetamine on or about April 20, 2018,
in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii)***

#### *as to Defendant Jose MORA*

23. On April 19, 2018, at the direction of FBI investigators, CHS sent several text messages to MORA at TT-2. Investigators confirmed the text messages between CHS and TT-2 by reviewing the text message history between CHS and TT-2 on CHS's cellular telephone. CHS provided screen shots of the text messages below to investigators. CHS wrote, "I have some cash to try and get back up on my feet again. Wats a half." Based upon my training and experience and familiarity with this investigation, the term "half" here referred to one half pound of methamphetamine.

24. MORA responded from TT-2, "How much u got my boy." CHS said, "I have 16." MORA replied, "I'll do it." CHS said, "I am trying to get some people to throw in on it so I can just

11

go full." MORA responded, "Let me know." Based upon my training and experience and familiarity with this investigation, the phrase "go full" here referred to purchasing one pound of methamphetamine.

25. On April 20, 2018, at approximately 5:29 p.m., at the direction of FBI investigators, CHS placed a recorded telephone call to TT-2, which was monitored and recorded. This call was made in the presence of investigators. Investigators confirmed the call to TT-2 by reviewing the call history on CHS's cellular telephone. In this call, CHS told MORA that CHS had $3,000. MORA responded, "[T]he full one?" CHS affirmed.

26. In this call, I believe that, based on my training, experience, and familiarity with this investigation, CHS and MORA were discussing a proposed one-pound methamphetamine transaction. In earlier text message conversations MORA and CHS had agreed upon a half pound of methamphetamine or one pound of methamphetamine depending on how much money CHS could collect. I believe that when MORA asked, "The full one?" MORA was referring to a full pound of methamphetamine.

27. At approximately 6:23 p.m. on April 20, 2018, CHS sent a text message to MORA at TT-2. Investigators confirmed the text messages between CHS and TT-2 by reviewing the text message history between CHS and TT-2 on CHS's cellular telephone. CHS provided screen shots of the below text messages to investigators. CHS asked, "How long do you think?" At 7:01 p.m., MORA responded "Ima pick it up now." MORA continued by asking, "U said u got $3000?" CHS said, "Yeah bro." MORA then asked, "U remember [h]ow much I was giving them to u?" CHS responded, "Last time it was 3." MORA said, "Ok."

28. In the early evening of April 20, 2018, investigators searched the CHS prior to CHS's arranged meeting with MORA at Popeye's, finding no contraband. CHS was provided FBI

12

official funds for the anticipated methamphetamine transaction and fitted with a recording device.

29. At 7:06 p.m. that evening, investigators conducting surveillance observed MORA park in front of trailer #30 at 2725 Kietzke Lane Reno, Nevada.[2]  At 7:08 p.m., MORA left trailer #30 and headed to the meeting location for the one-pound methamphetamine transaction.  At approximately 7:11 p.m., MORA sent a text message saying, "Here."  At the time, investigators observed MORA arrive at Popeye's.

30. Investigators observed CHS meet with MORA in the parking lot of Popeye's.  At 7:13 p.m., CHS entered the passenger side of MORA's gold Dodge Nitro.  During this meeting, CHS purchased approximately one pound of methamphetamine from MORA in exchange for $3,000 FBI pre-recorded funds.  Immediately after the transaction with MORA, CHS returned directly to the pre-determined meet location with investigators and relinquished custody of the methamphetamine purchased from MORA.  Investigators transported the methamphetamine to the FBI Reno Resident Agency where it was processed as evidence and found to weigh approximately 538.7 gross grams.  The substance field-tested presumptively positive for methamphetamine.  The foregoing controlled purchase of methamphetamine from MORA was audio and video recorded.

---

[2] In May 2018, investigators observed a notice on trailer #30 at 2725 Kietzke Lane, Reno, Nevada, indicating it was condemned.  At about that time, based upon investigators' surveillance, MORA began using trailer #12A at 2725 Kietzke Lane, Reno, Nevada.

## *Count 4*

### *Distribution of 50 grams of a mixture and substance containing a detectable amount of methamphetamine on or about April 30, 2018, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii)*

### *as to Defendant Jose VEGA, a/k/a Panda*

31. On April 28, 2018 and April 29, 2018, CHS and VEGA exchanged multiple text messages between CHS's cell phone and cell phone assigned call number (775) 857-6056, a cell phone believed to be used by VEGA, to coordinate a gun and methamphetamine transaction.  In text messages between these two phones, VEGA asked CHS, "Monday for the Ps [Pounds] or the peace [gun]."  CHS responded that CHS wanted both.  VEGA agreed.

32. On April 30, 2018, at approximately 2:30 p.m., surveillance was set up at VEGA's apartment, which at the time was located at 445 Sullivan Lane, Sparks, Nevada.   At approximately 3:46 p.m., CHS and VEGA continued exchanging multiple text messages.  During that exchange, VEGA provided a new cell phone number of (775) 771-7840 to CHS.   CHS wrote to VEGA, "Yo bro he want to do a pound and the weapon."  VEGA responded, "Ok.Ill let ya kno when im ready."  VEGA later wrote, "How bout i got a half for now and the pistol" to which CHS replied, "Ok wats the price on the half."  VEGA then texted CHS, "Im gonna have the full one and the peace."

33. At 5:34 p.m., investigators observed VEGA arrive at 200 Crampton Street, Reno, Nevada, which was the location for the arranged gun and drug transaction.  Investigators were able to determine that VEGA arrived at that location in a white Volkswagen Jetta bearing Nevada license plate number 95G678.  The Jetta was parked on the south side of the residence on Malone Street.

34. At 6:06 p.m., investigators heard via transmitter that VEGA and CHS agreed to a price of $1,700 for a half pound of methamphetamine.  Investigators observed VEGA exit 200

Crampton Street, Reno, Nevada, and walk to the white Jetta's front passenger door. VEGA

retrieved a blue/brown bag from the Jetta, and walked back into 200 Crampton Street.

VEGA and CHS weighed the methamphetamine, and CHS paid Vega $1,700. VEGA then

exited 200 Crampton Street and walked back to the Jetta.

35. At 6:28 p.m., CHS and FBI investigators met at a pre-determined location. CHS relinquished

the suspected methamphetamine and loaded weapon to agents. I, Special Agent McKinney,

and TFO Robinson transported the drug evidence and handgun to the FBI Reno Resident

Agency where it was processed. A positive field test of the drug evidence confirmed the

presence of methamphetamine. The methamphetamine weighed approximately 324.9 gross

grams.

## *Count 5*

***Conspiracy to Distribute and Possess with Intent to Distribute (i) at least 500 grams of a
mixture and substance containing a detectable amount of methamphetamine,
(ii) a mixture and substance containing a detectable amount of cocaine, and (iii) a mixture
and substance containing a detectable amount of heroin,
in violation of 21 U.S.C. 841(a)(1), 841(b)(1)(A)(viii), 841(b)(1)(B)(C), and 846***

*as to Defendants
Jose MORA,
Sandy Diaz TAVARES,
Jose VEGA, a/k/a Panda,
Angel DIAZ,
Javier CHAVEZ,
Shawn CURL,
Marcos HERNANDEZ a/k/a Bigotes,
Roberto MORA-Mora,
Juan BACA, a/k/a Sneaky,
Nyra Navarro-ORTIZ, a/k/a Chavela,
Richard ROSSALL, a/k/a Monopoly,
Ciara HERNANDEZ, and
Marco Antonio RAMIREZ, a/k/a Anthony,*

36. Beginning at an unknown date, but no later than on or about April 2, 2018, and

continuing to at least May 30, 2018, the Defendants conspired to distribute and possess

with intent to distribute (i) at least 500 grams of a mixture and substance containing a detectable amount methamphetamine, a Schedule II controlled substance, (ii) a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and (iii) a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in the District of Nevada, and elsewhere. The following summarizes some of the events there were part of, or in furtherance of, the conspiracy.

     a.     April 3, 2018, Methamphetamine Transaction Involving
              Sandy Diaz TAVARES and Jose MORA

37. On April 3, 2018, MORA, using TT-1, engaged in a series of calls with Sandy Diaz TAVARES (hereinafter "TAVARES"), who was using a phone assigned number (775) 507-9908. The conversation began at approximately 8:12 p.m., when TAVARES called MORA. In that conversation, TAVARES wanted to know how much for a gram of "clear." Based upon my training and experience and my work on this investigation, I believe the reference to "clear" was to clear methamphetamine; that is, methamphetamine that was not colored "blue" that MORA also distributed as part of this conspiracy.

38. MORA told TAVARES it will be "30." MORA told him to meet him where they met the first time because he (MORA) was busy. TAVARES said he will call MORA when he gets there. At 8:58 p.m., another call was intercepted from TAVARES to MORA. TAVARES told MORA that he (TAVARES) was outside by MORA's car.

39. At 8:56 p.m., investigators conducting surveillance observed a white Toyota pickup bearing Nevada license plate 023C97, believed to be associated with TAVARES, enter the apartment complex where MORA lived at the time (1590 Lewis Street, Reno, Nevada). Thereafter, at 9:03 p.m., investigators conducting surveillance observed the Toyota pickup bearing license plate 023C97 leave the apartment complex where MORA

resided. Based upon the intercepted communications and the corresponding surveillance, I believe MORA provided TAVARES with clear methamphetamine.

      b.     One Pound Methamphetamine Transaction Involving Jose MORA, Jose VEGA, a/k/a Panda, and Angel DIAZ on April 6, 2018

40. On April 6, 2018, Jose MORA ("MORA") received a call from Jose VEGA ("VEGA") over TT-1. MORA said he just now got out of work and now has to go get "them." VEGA told MORA that he may be interested in a tool VEGA has, a new AR-15. MORA asked how much VEGA wanted for it to which VEGA replied a minimum of eight, and MORA said no. MORA said he has some rifles and two AKs. VEGA said they can talk more about it when they meet and adds that he (VEGA) really needs "one." MORA asked if VEGA meant "a whole one" and VEGA said yes. Based upon my training, experience, and intercepted communications of MORA involving TT-1, I believe the reference to "a whole one" meant a pound of methamphetamine.

41. At 3:54 p.m., investigators conducting surveillance observed MORA's black Charger arrive at 2725 Kietzke Lane, Space 30, Reno, Nevada. A second vehicle, a white Isuzu pickup truck that agents knew from previous surveillance and intelligence to be one of the vehicles MORA drove (hereinafter, the "Isuzu"), was also parked at this trailer residence as well. At 4:26 p.m., MORA using TT-1 called VEGA. VEGA asked MORA to give him 10 minutes because he's counting the money. MORA then said he's ready and asked VEGA to let him know. MORA said the price is 35 because it is all rocks. Based upon my training, experience, and intercepted communications of MORA over TT-1, I believe "35" was a reference to $3500, which would be consistent with the going rate for a pound of methamphetamine. VEGA asked if it is that price, because of the two hundred dollars he owed MORA and MORA said no, it is 35 because they are all rocks.

MORA and VEGA argued a bit about the price, and VEGA said they can talk about the price when they meet with each other.

42. On April 6, 2018, at 4:56 p.m., a call was intercepted between MORA using TT-1 and telephone number (775) 378-9814. In this call, MORA stated that he was at the trailer weighing that stuff with Angel.

43. At 5:15 p.m. that same day, investigators observed a black pickup truck bearing Nevada license plates CP9078 (the "black pickup truck"), which investigators knew from previous surveillance and intelligence belonged to VEGA, parked in front of 1590 Lewis Street (which at the time was MORA's residence).

44. At 5:20 p.m., MORA and VEGA exchanged several texts discussing the location of their meeting for this transaction. MORA told VEGA that MORA sent his nephew, who investigators determined to be Angel DIAZ (hereinafter, "DIAZ"), in a white truck who was wearing a dark red LA hat to meet VEGA. VEGA said he is at the same spot as last time and does not see him. VEGA clarified and told MORA he is at the entrance of the apartments.

45. At 5:23 p.m., MORA called VEGA. VEGA told MORA that he's parked where they met the last time and that VEGA has been waiting for 30 minutes. MORA told VEGA he will try to contact his nephew, who is driving the Isuzu. Vega confirmed that he remembered the Isuzu (which investigators had noticed at 2725 Kietzke Lane, Space 30, which looked at the time to be a storage location for drugs for MORA). At 5:28 p.m., MORA called VEGA. MORA told VEGA to meet at the McDonald's restaurant located near Kietzke and Vassar (which is in Reno, Nevada). At 5:34 p.m., VEGA informed MORA that he is at the McDonald's in the black pickup truck. At 5:35 p.m., investigators observed the black pickup truck enter the McDonald's parking lot located at 1150 Kietzke Lane, Reno,

Nevada.  Shortly thereafter, investigators observed the Isuzu enter into the same McDonald's parking lot. The Isuzu parked next to the black pickup truck.  Angel DIAZ, wearing a red baseball cap with the logo "LA," got out of Isuzu holding a black duffel bag and entered the passenger side of the black pickup truck. At 5:45 p.m., DIAZ got out of the black pickup truck and returned to the Isuzu.  Both vehicles left the location at this time.

46. Based on my training and experience, the training and experience of other investigators with whom I have consulted, my knowledge of this investigation, other transactions involving the CHS, and other intercepted communications involving MORA, I believe that the MORA was selling one pound of methamphetamine to VEGA with the assistance of his nephew, Angel DIAZ.

47. Investigators later learned that DIAZ had been arrested and booked into the Washoe County Detention Facility (WCDF) on April 10, 2018, on charges of Possession of a Stolen Firearm and Obstructing/Resisting and Harassment. On April 13, 2018, investigators went to the WCDF to look at DIAZ's personal items that he had in his possession at the time of his arrest.  Documented in the Inmate Clothing Description/Inventory form was a "red hat."  A Washoe County Deputy retrieved the air-sealed bag containing DIAZ's belongings, which included a red hat with an "LA" logo on the front.  This hat matched the hat observed by investigators worn by DIAZ on April 6, 2018, when he met VEGA in the McDonald's parking lot.

    c.    One Pound Methamphetamine Transaction involving
          Shawn CURL and Jose MORA on April 8, 2018

48. Over TT-1, MORA received a text message from telephone number (775) 544-6428, a cell phone believed to belong to Shawn CURL (hereinafter "CURL"), which read, "What

up doe." MORA responded "What up homeboy." Several messages later, MORA received a text message saying "…I can probably shoot you that tonight around 7?" MORA also sent a text message, which read, "If you want more let me know." CURL responded, "I'm probably not gonna take more the people that I was giving the most to get it for cheaper than me now so idk I have a few left still." MORA responded, "Them people just want it cheaper too."

49. MORA asked, "How much u selling it to them for?" CURL responded, "Yeah fuck it they'll be back...250 a zip." MORA said, "Listen, Cut it a lil bit. You'll end up making the same profit." MORA then said, "I'll do it. I'll give it to you cheaper." MORA explained, "If u put like 3 to 5 grams of cut in each one...you'll still make profit. The shit will still be good. I'll sell it to u however u want it." CURL responded, ""I'll see what they want to do I think they're getting for like 25 it might not be worth it." MORA asked, "$250 a zip?" CURL said, "2500 a p." MORA responded, "Dammmnnnn. I'll see what I can do. You'll pay the $2500?"

50. At 7:40 p.m., investigators observed MORA walk across Lewis Avenue (north) and approach a silver sedan, bearing Nevada plates WAA001 (hereinafter, the "silver sedan"), a vehicle registered to Shawn CURL. MORA stood at the driver's side window and talked to driver for approximately five minutes then walked back across Lewis Avenue to his (MORA's) apartment.

51. At 7:43 p.m., investigators followed the silver sedan for a short period of time when it left the area of Lewis Avenue before terminating surveillance because the silver sedan driving in a manner consistent with attempting to detect law enforcement presence. At 8:04 p.m., investigators located the silver sedan which returned to an address located at 18119 Cherry Leaf Court, Cold Springs (part of the greater Reno area), Nevada.

Investigators who conducted surveillance and other records reveal that this address is the residence of Shawn CURL.

52. Based on my training and experience, the training and experience of other agents with whom I have consulted, my knowledge of this investigation, and other intercepted calls prior to and following this communication, I believe in the above text messages, as corroborated by surveillance, that MORA sold a pound of methamphetamine to Shawn CURL for $2500. MORA also talked extensively with CURL about "cutting" the methamphetamine, which, based upon my training and experience, is adding another product to the drug to increase the amount that can be sold to customers.

> d.    April 8, 2018, Cocaine Transaction
>         Involving Sandy Diaz TAVARES and Jose MORA

53. On April 8, 2018, at approximately 1:11 p.m., Sandy Diaz TAVARES (hereinafter, "TAVARES") asked MORA, at TT-1, if he (MORA) had any coke and that he wanted a "40 for a new client." MORA was at the Convention Center [believed to be a reference to the Reno Convention Center], but would call TAVARES in about an hour.

54. At 2:24 p.m., TAVARES and MORA agreed to meet at "the little store where [they] used to meet before...by Yori." TAVARES and MORA agreed to meet in ten minutes. TAVARES asked MORA to bring him four, at which time MORA asked "Forty...of the white kind?" TAVARES responded "yes." At 2:40 p.m., TAVARES texted "It better be good. He is a good client."

55. At 7:55 p.m., TAVARES again texted and called MORA saying he wanted "60" and it had to be better and stronger than what MORA gave him last time and it had to be "rock." TAVARES said the other one was loose and now he wanted 60 but he needed it to be harder. MORA called TAVARES and said it's the same one, so how can it be better. At 8:18 p.m., TAVARES told MORA he was at the store at which time MORA

instructed TAVARES to go where they met the first time.  At 8:27 p.m., TAVARES informed MORA he was there.

56. At 8:30 p.m., investigators conducting surveillance observed a gold Ford Expedition travel west on Lewis Avenue in Reno, Nevada, and enter the apartment complex, reverse, then park close to MORA's residence at the time.  TAVARES got out of the Expedition and walked north to the north sidewalk.  After approximately 30 seconds, MORA appeared between two trucks.  MORA and TAVARES walked back toward the Lewis Avenue apartment, where MORA resided.  TAVARES entered the Ford Expedition and drove east on Lewis Avenue, and then south on Gould, departing the area.

57. Based on my training and experience, the experience of other investigators with whom I have consulted, my knowledge of this investigation to date, and the context of these calls with each other during this series of calls and in connection with corresponding surveillance, I believe that TAVARES initially ordered one gram of methamphetamine from MORA.  In my training and experience, drug traffickers often use the word "clear" to refer to methamphetamine.  Second, TAVARES purchased a "40" of cocaine from MORA.  TAVARES mentions that the cocaine was for a new client.  Finally, TAVARES purchased a "60" from MORA and requested that it be harder and not loose like the previous purchase of cocaine.  Based upon my training and experience, I believe that TAVARES wanted a "harder" form of cocaine because he believed it to be a more pure form of cocaine. TAVARES' concern about the "loose" quality of the cocaine product is likely a reference to the lack of purity of the cocaine (which is likely caused by the use of a cutting agent).

e.    One Pound Methamphetamine Transaction Involving
      Jose MORA and Sean CURL on April 10, 2018

58. In intercepted communications on April 10, 2018, between MORA, using TT-1, and
    CURL, CURL asked MORA how much he's going to give them to him.  CURL said he
    can't keep paying 32.  MORA asked CURL to give him a reasonable number.  CURL
    said he wants to pay 27.  MORA says he can do 27.  MORA said he was driving.  MORA
    said he will be busy and it will be better if he (MORA) drops it off to CURL.

59. At 8:40 p.m. on April 10, 2018, MORA informed CURL that MORA will head over now
    to CURL's house.  At 8:59 p.m., investigators conducting surveillance observed a gold
    Dodge Nitro bearing Nevada plate 479D67, registered to MORA, exiting U.S. 395
    northbound at Cold Springs exit, head southbound on Village Parkway in Cold Springs
    towards CURL's residence at 18119 Cherryleaf Court Reno, Nevada.  At 9:00 p.m.,
    MORA sent a text message to CURL asking to let him in.  At 9:05 p.m., investigators
    conducting surveillance observed MORA's gold Dodge Nitro travelling southbound
    away from CURL's residence.

60. Based on my training and experience, the training and experience of other investigators
    with whom I have consulted, my knowledge of this investigation, and corroborating
    surveillance, I believe that CURL was asking for MORA to buy one pound of
    methamphetamine for $2700.  This amount is similar to past amounts CURL has
    purchased and within the dollar amount for one pound of methamphetamine.  Here, the
    intercepted communications reflect a preexisting relationship between CURL and
    MORA, given the reference, for instance, to "keep paying."

f.    Seven Grams of Methamphetamine Transaction Involving
Javier CHAVEZ and Jose MORA on April 10, 2018

61. On April 10, 2018, beginning at approximately 8:44 p.m., communications were intercepted between Javier CHAVEZ (hereinafter "CHAVEZ") using a phone assigned call number (775) 722-2372 and MORA using TT-1. MORA told CHAVEZ to go to Lewis because MORA remembered MORA left "that" in Mora's car. At 8:49 p.m., CHAVEZ asked for the same thing he got last time and he will pay MORA $100 and the rest tomorrow. CHAVEZ said the cost should be 100 because CHAVEZ has not been working a lot lately.

62. At 9:04 p.m., MORA told CHAVEZ to get into the car and he will find a can that looks like a Monster Drink and a "seven." MORA said it's in the black car. CHAVEZ asked what he should do with the money and MORA tells him to just leave it there. At 9:43 p.m., MORA said he will head over in a little while. CHAVEZ told MORA it was a gram short. MORA said he will give him the gram when they meet.

63. Based on my training and experience, the training and experience of other investigators with whom I have consulted, my knowledge of this investigation, and the intercepted communications, I believe that a MORA and CHAVEZ's conversation led to the sale of 7 grams of methamphetamine hidden inside a Monster drink can. The usage of "gram" and "seven" to discuss how much was sold is common for methamphetamine trafficking. Here, the communications reflect a preexisting relationship between CHAVEZ and MORA, given the reference, for example, to "same thing as last time."

g.    Half Ounce Methamphetamine Transaction Involving
Javier CHAVEZ and Jose MORA on April 15, 2018

64. On April 15, 018, beginning at approximately 2:34 p.m., communications were intercepted between CHAVEZ using (775) 722-2372 and MORA using TT-1. CHAVEZ

24

asked MORA for a "seven up."  MORA informed CHAVEZ that he left a half in the

trailer by "the green pipe."  MORA said CHAVEZ could cut it in half.  CHAVEZ

responded, "or I'll take it and later I'll give you the rest."  MORA instructed CHAVEZ to

"leave the money there if you want."

65. Based on my training and experience, the training and experience of other agents with

whom I have consulted, my knowledge of this investigation, and these communications

taking in context with other conversations and before and after this exchange (with

corroborating surveillance), I believe that MORA agreed to sell a half ounce of

methamphetamine to CHAVEZ and for CHAVEZ to obtain it by the trailer, which I

believe is a reference to trailer #30, 2725 Kietzke Lane, Reno, Nevada, a trailer used by

MORA at that time.  Investigators determined that CHAVEZ resides in trailer #10A,

2725 Kietzke Lane, Reno, Nevada.  Therefore, CHAVEZ would have easy and close

access to the trailer by the green pipe as MORA mentioned in the foregoing

communications.

      h.    Seven Grams of Methamphetamine Transaction
            Involving Javier CHAVEZ and Jose MORA on April 17, 2018

66. On April 17, 2018, beginning at approximately 9:43 a.m., communications were

intercepted between CHAVEZ using (775) 722-2372 and MORA using TT-1.  CHAVEZ

asked MORA if he had anything "because they want something."  MORA responded that

he didn't have anything at that time. C HAVEZ called MORA again at 3:30 p.m. and

after asking where MORA was, stated "they want something again but he is leaving

now."  MORA responded he'll be there in 20 minutes.  CHAVEZ replied "let me see

what he says."

67. At 6:33 p.m., CHAVEZ called MORA and said CHAVEZ needed 30 and "Give me one and I'll pay you tomorrow for the rest." MORA instructed CHAVEZ to go to the trailer and asked if it was "seven." CHAVEZ answered yes and that he only had 30 now. MORA said there were four bags there, and to take the seven, or the smaller of the two biggest bags, and leave the money there. The biggest bag was a half. CHAVEZ said he'd give MORA everything tomorrow.

68. Based on my training and experience, the training and experience of other agents with whom I have consulted, my knowledge of this investigation, and these conversations taken in context with other communications (and corroborating surveillance), I believe that MORA and CHAVEZ discussed MORA selling CHAVEZ a quarter ounce of methamphetamine. I also believe, based upon the communications, that CHAVEZ intended to sell the methamphetamine he obtained from MORA to a third party.

       i.      Marcos HERNANDEZ, a/k/a Bigotes, and CIARA Hernandez
                 <u>Pick Up Drugs in California for Jose MORA on April 30, 2018</u>

69. On April 27, 2018 at 6:16 p.m., MORA using TT-1 made an outgoing call to Marcos HERNANDEZ a/k/a Bigotes (hereinafter, "HERNANDEZ"). MORA asked HERNANDEZ if he wants to do a trip over there today or very early tomorrow morning. HERNANDEZ said that he will let MORA know in a while so he can arrange things.

70. On April 28, 2018 at 7:51 p.m., MORA using TT-1 made an outgoing call to HERNANDEZ. MORA told HERNANDEZ that he (MORA) has been calling him. HERNANDEZ said he had some telephone issues. MORA said he (MORA) will give HERNANDEZ an address. HERNANDEZ put CIARA Hernandez (hereinafter, "CIARA," to avoid confusion with Marcos HERNANDEZ) on the line. MORA provided CIARA with the address "1951 East Broadway." MORA said it's in Anaheim or Orange

County. HERNANDEZ came back on the line and MORA repeated it is either Anaheim or Orange County. MORA told HERNANDEZ they were waiting for HERNANDEZ all morning long, and now MORA must call MORA's partner to see if they can meet with HERNANDEZ. HERNANDEZ said he had some problems with the phone. HERNANDEZ said he should be to Orange County in about an hour and a half. MORA later called HERNANDEZ and said it won't happen until tomorrow and then told HERNANDEZ to get a hotel for the night.

71. On April 29, 2018, at 12:34 p.m., MORA using TT-1 called HERNANDEZ and told HERNANDEZ to head over to the address MORA sent him because the people will be meeting him there in about 20 minutes. MORA called HERNANDEZ back at 8:42 p.m. later that day, in which HERNANDEZ informed MORA that they're almost there. HERNANDEZ said he's coming into Sacramento and MORA told HERNANDEZ to be careful.

72. The delivery of the narcotics to MORA was confirmed in an intercepted call over TT-1 from MORA to HERNANDEZ on April 30, 2018, at 4:15 p.m. MORA asked for the keys to the truck (which I believe is a reference to MORA's gold Dodge Nitro used by HERNANDEZ and CIARA to pick up the drugs in Anaheim, California). HERNANDEZ said he left them hanging by the entrance. HERNANDEZ asked MORA if there are any colored ones. MORA said he just got there and has not opened them up yet. MORA indicated he thought there were some colored ones. HERNANDEZ said he has been asked for those. MORA said he has to open them up and look. HERNANDEZ said he will let MORA know if they ask him again about those (believed to refer to the colored ones). HERNANDEZ and MORA agreed. Based upon the foregoing, and my

training and experience, I believe HERNANDEZ and CIARA delivered

methamphetamine back to Reno to MORA from Orange County, California.

      j.     **Drug Transactions Between Jose MORA and
ROBERTO Mora-Mora on May 2, 2018, May 3, 2018, and May 5, 2018**

73. On May 2, 2018 at approximately 8:58 p.m., Roberto Mora-MORA (hereinafter,

"ROBERTO," to avoid confusion with Jose MORA), using a phone number provided to

him by his employer Reno Green Landscape assigned number (775) 690-5178, called

MORA at TT-2 and said he wanted to come by "to get that stuff." MORA and

ROBERTO made plans to meet at Suzie's Adult Store (HEREINAFTER, "Suzie's"), 195

Kietzke Lane, Reno, Nevada.

74. At 9:08 p.m. that same evening, investigators observed a Hispanic male approach

MORA's black Dodge Charger in the parking lot of Suzie's. After the meeting, both

MORA and the Hispanic male left the parking lot. Investigators later identified the

Hispanic male to be ROBERTO Mora-Mora.

75. Based on my training and experience, the experience of other investigators with whom I

have consulted, my knowledge of this investigation to date, and the context of these calls

with each other and in combination with other transactions involving these two

individuals, and corresponding surveillance, I believe MORA sold ROBERTO narcotics

at Suzie's. Based upon their conversation, MORA and ROBERTO appeared to have a

preexisting drug trafficking relationship.

76. The next day, May 3, 2018, at approximately 5:22 p.m., ROBERTO called MORA over

TT-2 and asked for "snow white." ROBERTO informed MORA that he was asking for

the "snow white" for a friend. MORA and ROBERTO discussed the price, with MORA

saying "3 of the 100 will be about 6." At approximately 6:17 p.m., ROBERTO called

MORA and gave MORA directions on how to find his "friend" who wanted to buy "snow white." At 6:23 p.m., ROBERTO told MORA that his "friend" was on the corner of Sullivan and I Street (in Sparks, Nevada) with a black dog.

77. At 6:22 p.m. on May 3, 2018, investigators observed a Hispanic male, later identified at Raymundo Ramirez Casillas ("Casillas"), meet MORA at the corner of Sullivan and I Street. Casillas was walking a black German shepherd. MORA was parked to the east of Sullivan Lane on I Street, facing west. Casillas spoke to MORA through an open passenger side window on MORA's Dodge Charger. MORA and Casillas had a brief encounter before MORA drove south on Sullivan Lane and Casillas walked east on I Street.

78. Based on my training and experience, the experience of other investigators with whom I have consulted, my knowledge of this investigation to date, and the context of these calls with each other during this series of calls and in connection with corresponding surveillance, I believe ROBERTO acted an intermediary between MORA and Casillas, and I believe a reference to "snow white" in the communications above was a reference to cocaine, as cocaine is white in color.

79. Two days later, on May 5, 2018 at 6:11 p.m., ROBERTO called MORA at TT-2 and asked for a "half." ROBERTO told MORA he was at the trailer. At 6:28 p.m., MORA called ROBERTO. ROBERTO told MORA to go to the house instead of the trailer.

80. At 6:44 p.m. on May 5, 2018, investigators observed MORA, driving his Dodge Nitro, drive northbound on Sun Valley Boulevard, turn westbound onto West Second Avenue, and turn northbound onto Sidehill Drive, where investigators lost sight of the vehicle. ROBERTO lists 5250 Sidehill Drive Sun Valley, Nevada, as his residence with his employer.

81. In addition, on May 17, 2018, at approximately 6:21 p.m., ROBERTO called MORA at TT-2 and told him he was coming to MORA's house to give him 300 dollars from the last deal and another 140 dollars for some more. MORA told him to wait a little bit. At 7:26 p.m., MORA told ROBERTO he was on his way to ROBERTO's house. At 7:45 p.m., investigators watched the ping information from a GPS tracker recently installed and monitored on MORA's gold Dodge Nitro, as authorized by Court order in 3:18-mj-0061-VPC, revealing that MORA's gold Dodge Nitro was parked at the intersection of 2nd Avenue and Sidehill Lane in Sun Valley, Nevada, which is in the vicinity of 5250 Sidehill Drive Sun Valley, Nevada, the reported residence of ROBERTO.

82. Furthermore, on May 25, 2018, at 8:48 a.m, ROBERTO called MORA at TT-2 and asked for a "half an orange," referring, I believe, to a half ounce of methamphetamine based upon my training and experience and previously coded communications between ROBERTO and MORA as intercepted. ROBERTO said he wanted it "complete." I also believe (for the same reasons) ROBERTO's use of the term "complete" here refers to a full half ounce of methamphetamine, not a reduced amount. MORA asked ROBERTO how much he had to spend. ROBERTO said he had three hundred.

83. At 9:45 a.m. that same day, MORA called ROBERTO and said he only had the "color," referring to colored (or blue) methamphetamine. ROBERTO complained and asked if it was the same. MORA said it was from the same trip. At 10:29 a.m., MORA called ROBERTO from TT-2 and asks if he (ROBERTO) is home, ROBERTO said yes, and MORA replied that he was heading that way (Subject Premises 8). At 10:36 a.m., GPS "ping" data for MORA's cell phone, TT-2, revealed that TT-2 was at 5250 Sidehill Road, Reno, Nevada (Subject Premises 8). Furthermore, the GPS "ping" data for TT-2 before and after 10:36 a.m. that day, revealed that TT-2 was at 5250 Sidehill Road, Reno,

Nevada, for a short period of time. Based on my training and experience, the experience of other investigators with whom I have consulted, my knowledge of this investigation to date, and the context of these calls with each other during this series of calls and in connection with corresponding surveillance, I believe ROBERTO bought a half ounce of methamphetamine from MORA.

      k.      **Heroin Transaction Involving Juan BACA**
                    **and Jose MORA on May 5, 2018**

84. On May 5, 2018, beginning at approximately 1:06 p.m., communications were intercepted between Juan BACA (hereinafter, "BACA"), using (775) 409-2218, and MORA, using TT-1. MORA spoke to BACA multiple times. BACA informed MORA that he (BACA) sold the "half" last night and had some money for MORA. MORA said to let him know when BACA was ready. BACA replied he would ask "the guy" if he still wanted the stuff.

85. At 6:37 p.m., BACA told MORA he wanted "one." Previously, on April 28, 2018, BACA purchased two quarter ounces of "brown" from MORA. MORA said he'd have to see if he had enough and if not stop and get some. MORA and BACA arranged to meet at Suzie's, located at 195 Kietzke Lane, Reno, Nevada, at about 7:00 p.m.

86. At 7:18 p.m., BACA informed MORA that BACA was there. MORA answered he would be there in three minutes. At 7:27 p.m., BACA asked MORA how many were missing, at which time MORA answered three grams. BACA ended the call by saying he would pick it up and deliver it to him.

87. At 7:21 p.m., investigators observed MORA meet with BACA at Suzie's parking lot. BACA arrived in a black Volvo, bearing Nevada license plate 85E061, currently registered to Lamont Kepano of 335 Record Street, Reno, Nevada. BACA was briefly

inside MORA's vehicle, a gold Dodge Nitro. Investigators then followed BACA to 290 High Street, Reno, Nevada, the address listed on BACA's Nevada identification card.

88. At 7:52 p.m., BACA told MORA it was just 23 and a half. MORA replied to look in the car as it may have dropped. BACA then said he'd check but after he "drops it off" he'd contact MORA.

89. Based on my training and experience, the training and experience of other agents with whom I have consulted, my knowledge of this investigation, corresponding surveillance, and conversations before this exchange between the two in relation to BACA's previous purchase of "brown," which I believe is a reference to heroin, as heroin in this area appears brown in color, in these communications MORA and BACA conducted a heroin transaction of approximately 23.5 grams, which BACA intended to provide to another person (the "guy").

       l.     Marcos HERNANDEZ's Drug Transaction
               with Jose MORA on May 6, 2018

90. On May 6, 2018, at 3:15 p.m., Marcos HERNANDEZ called MORA at TT-1, and said that he wanted a half but he'll probably get a whole one because people from up there were coming. MORA asked if HERNANDEZ wanted to wait until they came and HERNANDEZ said yes. MORA told HERNANDEZ to call him (MORA) when they arrived.

91. At 5:45 p.m., Javier CHAVEZ called MORA at TT-1 using phone number 775-722-2372 saying that "Bigotes" (HERNANDEZ) wants "one." MORA said he would call Bigotes (HERNANDEZ) later.

92. At 6:35 p.m., MORA, using TT-2, called HERNANDEZ. HERNANDEZ said he still needs "one" and was on his way to MORA's apartment, believed to be a reference to 460

East Grove Street #33, Reno, Nevada, at this time. Several minutes later, MORA, still

using TT-2, called HERNANDEZ. HERNANDEZ said he was outside and MORA said

he would be right down.

93. At 6:39 p.m., investigators conducting surveillance observed HERNANDEZ arrive at 460

East Grove Street driving a Red Dodge pickup, license plate 308D02, registered to

HERNANDEZ. MORA met HERNANDEZ in the parking lot of 460 East Grove Street,

Reno, Nevada. MORA returned to his apartment (#33), and HERNANDEZ drove to 175

Grove on Wrondel Street Reno, Nevada.

94. Based on my training and experience, the training and experience of other agents with

whom I have consulted, my knowledge of this investigation, previous surveillance, and

conversations before and after this exchange, I believe that Jose MORA sold

HERNANDEZ one ounce of methamphetamine. HERNANDEZ said that he needed one

because people were coming. This indicates that HERNANDEZ planned to distribute the

ounce of methamphetamine to a third party (or third parties).

   m.    Two Ounces of Methamphetamine Transaction Involving
         Juan BACA and Jose MORA on May 7, 2018

95. On May 7, 2018, beginning at approximately 3:52 p.m., communications were

intercepted between Juan BACA ("BACA"), using (775) 409-2218, and MORA, using

TT-1. BACA sent a text message to Jose MORA saying, "I need one." At 3:53 p.m.,

BACA sent a text message to MORA again saying, "Need 1z in about 45 min." MORA

replied, "Call me when u ready." At 4:20 p.m., BACA asked MORA if he still had the

"blue." MORA replied that he did. At 4:29 p.m., BACA called MORA. While on the

phone, as the communications revealed, BACA and MORA made visual contact with

each other and met up.

96. At 6:48 p.m., BACA again called MORA and said he needed "one blue one." MORA said he needed to go to his house first to get it. BACA said he was at Suzie's and MORA said it would be about 20-30 minutes. At 7:13 p.m., MORA asked if BACA was still at Suzie's and that he (MORA) was on his way.

97. At 7:14 p.m., investigators conducting surveillance observed MORA pull into the parking lot at Suzie's in Reno, Nevada. MORA handed a package to BACA who was in a black Volvo bearing license plate 85E061. At 7:25 p.m., BACA pulled into an alley between Crampton Street and Burns Street in Reno, Nevada.

98. Based on my training and experience, the training and experience of other agents with whom I have consulted, my knowledge of this investigation, law enforcement surveillance of the later exchange, and intercepted communications, I believe that MORA was selling BACA one ounce of blue methamphetamine on two separate occasions, the latter one in Suzie's parking lot, Reno, Nevada.

       **n.**      **Nine Ounce Methamphetamine Transaction Involving Jose MORA, Javier CHAVEZ, and Sean CURL on May 8, 2018**

99. On May 8, 2018, MORA, using TT-1, sent Shawn CURL ("CURL"), at call number (775) 544-6428, a text message, reading, "Uneed more?" CURL replied, typing "Yeah but I need all chunks lol."

100. At 6:49 p.m. that day, as revealed by law enforcement surveillance, MORA exited his apartment, 460 East Grove Street #33, and collected a blue bag from his white Isuzu truck. MORA placed the bag in the rear passenger portion of his Dodge Charger and walked back to his Isuzu, before walking to his Dodge Nitro. MORA then opened and immediately shut the hood to his Dodge Nitro.

101. Javier CHAVEZ ("CHAVEZ") drove MORA's white Isuzu truck, while MORA drove the gold Dodge Nitro to 505 White Horse, Sun Valley, Nevada. CHAVEZ and MORA left the Isuzu truck in Sun Valley, and CHAVEZ got in the Nitro with MORA.

102. CURL, using a phone assigned call number (775) 544-6428, sent a text message to MORA at TT-1, which read, "Or leave the dust separate please lol." MORA replied, "I only got 10 zips left." CURL wrote back, "If it's chunks shoot it." MORA responded, "Chunks would only b 249 g's."

103. MORA, using TT-1, then sent CURL a text message at (775) 544-6428, which read, "Make it an even 9?" CURL then asked, "So how much." MORA answered, "$1700?"

104. At 7:17 p.m., CURL, using (775) 544-6428, sent a text message to Mora using TT-1, typing "Yeah 17 basically same shit for the 9." CURL followed up, texting, "All chunks that's fine I'll make it work." MORA agreed. MORA then wrote, "On my way."

105. At approximately 7:45 p.m., investigators observed MORA park his Dodge Nitro in front of 18119 Cherryleaf Court, Reno, Nevada, which is CURL's residence to investigators' knowledge. MORA drove directly from 505 Whitehorse to CURL's residence at 18119 Cherryeaf Court. CHAVEZ remained in MORA's vehicle during the drive to CURL's residence. At 7:45 p.m., MORA sent a text message to CURL advising, "Here."

106. Investigators observed MORA exit the driver's seat of his Dodge Nitro, place a blue colored bag in the front passenger side wheel well of the Nitro, and return to the driver's seat of the Nitro. CURL walked towards the Nitro and spoke to CHAVEZ and MORA. CURL placed his hands in the front passenger side wheel well and removed a blue colored bag. CURL carried the blue bag to his grey colored Toyota sedan parked in his

driveway and placed the bag in an open trunk. CURL then handed the blue bag to

MORA. MORA and CHAVEZ then left CURL's residence in the Dodge Nitro.

107. At 8:12 p.m., MORA's Dodge Nitro entered the parking lot of 460 E. Grove Street.

MORA exited the driver's seat, walked to his Dodge Charger, opened the driver's door to

the Charger, shut the driver's door, opened a passenger side door to the Charger, removed

a blue colored duffle bag, and walked south through the parking lot. CHAVEZ drove the

Dodge Nitro south through the parking lot and parked. CHAVEZ then entered Mora's

apartment at 460 East Grove Street, #33.

      o.     <u>Marcos HERNANDEZ's Drug Transaction with MORA on May 11, 2018</u>

108. On May 11, 2018, at 9:04 p.m., Marcos HERNANDEZ a/k/a Bigotes (hereinafter

"HERNANDEZ"), called MORA on TT-1; the following synopsized conversation was

intercepted. MORA said he was ready. HERNANDEZ said he was waiting for "some

guys" because HERNANDEZ was short $100. HERNANDEZ told MORA that even if

HERNANDEZ didn't get paid, he still wanted at least half. At 9:17 p.m., an unidentified

male (hereinafter, "UM1") asked MORA to bring him a "seven" and "half of the blue"

for "Bigotes." At 9:42 p.m., MORA informed HERNANDEZ he was at the trailer.

MORA and HERNANDEZ agreed to meet there.

109. At 10:08 p.m. that same evening, HERNANDEZ called MORA back to tell him the

people were weighing the stuff and it was short "four points." MORA put the call on

hold to weigh the half he had. When he came back MORA said HERNANDEZ's half

was supposed to weigh 15.1-15.15 since he cut it in half, but HERNANDEZ responded it

only weighed 13.96. MORA agreed to give HERNANDEZ the other half.

HERNANDEZ informed MORA he was on his way to him at 10:11 p.m. MORA said he

was at his apartment. At 10:15 p.m., HERNANDEZ called MORA to say he was outside.

110. Based on my training and experience, the training and experience of other agents with whom I have consulted, my knowledge of this investigation, and other drug-related calls intercepted between the two, I believe that HERNANDEZ asked MORA for a ½ ounce of methamphetamine, and that HERNANDEZ asked for this methamphetamine from MORA to sell to others.

      p.      Drug Calls and Transactions between MORA and
              Nyra Navarro-ORTIZ on May 13, 14, and 23, 2018

111. On May 13, 2018, at 12:14 p.m., MORA, using TT-1, received a call from Nyra Navarro-ORTIZ, a/k/a Chavela (hereinafter, "ORTIZ"), using (775) 722-2372 (which is CHAVEZ's phone, as ORTIZ resides with CHAVEZ). ORTIZ asked MORA when he's going to bring the rest because they [unspecified] are probably going to need another but she isn't sure yet. MORA said it'll be in a while. ORTIZ said if not, tomorrow. MORA teased her and then said he will go in a little while. ORTIZ said she does not want any "colors." MORA said that's all he's got. ORTIZ said to bring another when he comes because they will probably want it. MORA agreed.

112. Based on my training and experience, the training and experience of other agents with whom I have consulted, my knowledge of this investigation, corroborating surveillance, and these conversations involving the Target Device, I believe that ORTIZ called MORA to order methamphetamine. ORTIZ added that she did not want any colors, meaning she preferred the clear methamphetamine to the colored (that is, blue) methamphetamine.

113. On May 14, 2018, at 11:20 a.m., ORTIZ made a call to MORA from telephone number (209) 594-3957. ORTIZ asked if MORA was working because she wanted him to bring her something. MORA said he was working until about 4 p.m. ORTIZ asked him to come by. MORA agreed.

114. Based on my training and experience, the training and experience of other agents with whom I have consulted, my knowledge of this investigation, corroborating surveillance, and these conversations involving the target devices, I believe that ORTIZ requested that MORA bring by a quantity of methamphetamine to ORTIZ and that MORA agreed to deliver the methamphetamine once he got off work.

115. On May 23, 2018, at 4:20 p.m., MORA received an incoming call on TT-1 from ORTIZ using telephone number (775) 391-1829. ORTIZ asked MORA for an "8" and stated that she doesn't want any of the colored ones. I believe, based upon my training, experience, and my work in this investigation, that "8" here referred to what is also called an "eight-ball" of methamphetamine, which is approximately 3.5 grams. MORA agreed and stated that he'll have it ready in 10 to 15 minutes. Several minutes later, ORTIZ sent a text message to MORA, writing, "Never mind" followed by "I'll let you know because the person is not here yet." MORA wrote back, "Ok." At 6:29 p.m. on the same day, ORTIZ, using (775) 391-1829, called MORA's phone, TT-1, and informed MORA that she's ready now. MORA replied that he's on his way right now.

116. At 6:34 p.m. that same day, investigators observed MORA exit 460 East Grove Street in his black Dodge Charger. At 6:35 p.m., MORA drove his black Dodge Charger into the south side of the trailer park at 2725 Kietzke Lane and parked at trailer #12A. At 6:36 p.m., a female with dark colored hair, believed by investigators to be ORTIZ, stood next to MORA's black Dodge Charger and met with MORA. At 6:40 p.m., MORA entered his black Dodge Charger and exited 2725 Kietzke Lane.

117. Based on my training and experience, the training and experience of other agents with whom I have consulted, my knowledge of this investigation, corroborating surveillance, and these conversations involving the target devices, I believe that ORTIZ ordered

approximately 3.5 grams of methamphetamine and specified that she doesn't want the colored methamphetamine (preferring the clear, not the blue methamphetamine). MORA agreed to deliver the methamphetamine to ORTIZ. ORTIZ later told MORA that she was still waiting on the other person, believed by investigators to be ORTIZ's methamphetamine customer. Investigators believe that the methamphetamine customer subsequently arrived with payment and, at that time, ORTIZ called MORA to say that she was ready to complete the drug transaction. Investigators observed MORA meet with a female believed to be ORTIZ in front of 2725 Kietzke Lane, Reno, Nevada, where MORA had parked his black Dodge Charger. Investigators have determined that ORTIZ and CHAVEZ reside in trailer #10A at 2725 Kietzke Lane, Reno, Neva, which is in the same trailer park and in close proximity to MORA's trailer, #12A.

    q.    May 17, 2018, Payment for Previous Drug Transaction Between Jose MORA and ROBERTO Mora-Mora, and Additional Drug Transactions Between MORA and ROBERTO on May 19, 2018, and May 25, 2018

118. On May 9, 2018, at approximately 8:25 p.m., MORA using TT-2 and ROBERTO Mora-Mora (hereinafter, "ROBERTO"), using (775) 690-5178, engaged in a coded drug conversation with MORA, whereby MORA agreed to bring "something" over to ROBERTO's house. On May 17, 2018 at approximately 6:21 p.m., ROBERTO, using (775) 690-5178, called MORA and told him he was coming to MORA's house to give him 300 dollars from the last deal and another 140 dollars for some more. MORA told him to wait a little bit. At 7:26 p.m., MORA told ROBERTO he was on his way to ROBERTO's house. At 7:45 p.m., the GPS tracker on Mora's gold Dodge Nitro revealed MORA parked at the intersection of 2nd Avenue and Sidehill Lane in Sun Valley, Nevada. This location is right next to ROBERTO's residence at 5250 Sidehill Drive Sun Valley, Nevada. ROBERTO lists this address as his residence with his employer.

119. On May 19, 2018, at approximately 6:52 p.m., MORA from TT-2 called ROBERTO. ROBERTO said he is heading to the neighborhood where CHAVEZ lives. MORA tells ROBERTO to wait until MORA gets back. At 7:08 p.m., ROBERTO asks MORA for $100 worth. MORA agreed.

120. On May 25, 2018, at 8:48 a.m., ROBERTO called MORA at TT-2 and asked for a "half an orange," which I believe is a reference to a half ounce of methamphetamine. ROBERTO added that he wants it "complete." MORA asked ROBERTO how much he had to spend. ROBERTO said he had three hundred.

121. At 9:45 a.m., MORA from TT-2 called ROBERTO and said he only had the "color." Based upon my participation in this investigation, and familiarity with intercepted communications, MORA has methamphetamine which is blue in color or clear in color that he distributes. Here, I believe MORA is informing ROBERTO that he only has blue methamphetamine to provide him; in other words, the "colored" methamphetamine.

122. In response, ROBERTO complained and asked if it was the same. MORA said it was from the same trip. MORA told ROBERTO that he is on his way to ROBERTO's house, which I believe was a reference to 5250 Sidehill Drive Sun Valley, Nevada, which is the residence ROBERTO lists with his employer.

123. Based on my training and experience, the experience of other investigators with whom I have consulted, my work in this investigation to date, and intercepted communications, I believe on May 25, 2018, ROBERTO bought a half ounce of methamphetamine from MORA. I further believe that ROBERTO ordered methamphetamine from MORA on other occasions as noted above, and that ROBERTO and MORA appear to have a preexisting relationship in terms of drug trafficking activity, given the reference to "300" from the last deal, and the use of coded language without confusion between the two.

   r. Controlled Substance Transaction Involving
     <u>Richard ROSSALL a/k/a Monopoly, and Jose MORA on May 20, 2018</u>

124. On May 20, 2018, beginning at approximately 11:39 a.m., communications were

  intercepted between Richard ROSSALL (hereinafter, "ROSSALL"), using (775) 409-

  9388, and MORA, using TT-1.  MORA sent a text message to ROSSALL, stating,

  "Monopoly it's me Jose" and then added, "Shawn gave me ur number."  [I believe the

  reference to Shawn is in regard to Shawn CURL.]  MORA then wrote, "I'm ready."

  ROSSAL later responded, "Hey esa, I'm leaving Fernley rite now, I'll be in town in

  about 35 min. or so, where do you want me to go???" MORA answered, "I'll b by

  grove."

125. At approximately 1:36 p.m., ROSSALL called MORA on TT-1.  ROSSALL identified

  himself and said he is on Oddie Boulevard heading to Grove.  MORA said he is at Grove

  finishing getting it ready.  ROSSALL asked what the price will be.  MORA said they will

  talk about it in person.

126. At 1:42 p.m., ROSSALL called Mora on TT-1 and said he is on Grove. MORA said he

  needs a few more minutes and said he will send a text to Monopoly to tell him where to

  wait. At 1:43 p.m., MORA sent a text message to ROSSALL telling ROSSALL to wait at

  "Orange."  Notably, MORA's apartment at 430 East Grove Street is located at the

  intersection of Grove Street and Orange Street, Reno, Nevada.

127. At approximately 1:44 p.m. on May 20, 2018, investigators observed a black Ford

  Crown Victoria arrive on Grove Street and park in the shopping center located at the

  intersection of Grove Street and Kietzke Lane.  The Crown Victoria was occupied by two

  male adults.  A Department of Motor Vehicle query on the black Ford Crown Victoria

  with Nevada license plate 261A97 revealed the registered owner to be Richard

  Strickland, at address 565 Sparks Blvd #227, Sparks, Nevada.

128. MORA, using TT-1, called ROSSALL and asked where ROSSALL (a/k/a Monopoly) was. ROSSALL said he was at the corner of Kietzke and Grove by the shopping center and car wash. Investigators s observed a black Ford Crown Victoria with license plate 261A97 located at the corner of Kietzke and Grove. MORA told him to go to Orange and Grove. ROSSALL said he is heading that way.

129. At approximately 1:53 p.m., consistent with these intercepted communications whereby MORA instructs ROSSALL to go to Orange and Grove, investigators observed the black Ford Crown Victoria travel west on Grove and stop at the corner of Orange and Grove. Three minutes later, investigators observed MORA walking away from the black Ford Crown Victoria with something in his hands.

130. Based upon the foregoing, I believe ROSSALL purchased drugs from MORA.

      s.      Methamphetamine Transaction Involving
              Richard ROSSALL a/k/a Monopoly, and Jose MORA on May 22, 2018

131. On May 22, 2018, beginning at approximately 8:21 p.m., communications were intercepted between Richard ROSSALL using (775) 409-9388 and MORA using TT-1. MORA made an outgoing call to ROSSALL and ROSSALL told MORA that he's almost ready. ROSSALL said he will call MORA back tonight as soon as he's ready. In a string of text messages, ROSSALL later wrote to MORA, "I've got 2,100 at this moment, and would still like to do a whole one, I'll have the balance tomorrow evening…" MORA responded, "Ok." MORA then texted ROSSALL, "Let me get it ready" and then asked, "You want all rock?" ROSSALL answered, "Yes…"

132. At approximately 10:23 p.m. that same evening, MORA wrote, "Give me like 15 min" and then asked, "Can u come to the same place?" ROSSALL answered, "I'll leave my place in 10 min and call you when I'm on grove. Yes same place." At 10:34 p.m, MORA

wrote, "Ready." At 10:47 p.m., ROSSALL called MORA and said that he was on Grove Street by the 7 Eleven. MORA told ROSSALL that he was waiting for ROSSALL at the same place [as last time] already.

133. Based on my training and experience, the training and experience of other agents with whom I have consulted, my knowledge of this investigation, previous surveillance, and conversations before and after this exchange, I believe that ROSSALL asked for a pound of methamphetamine from MORA but informed MORA that he only had $2,100, which is an amount short of the going rate for a pound of methamphetamine in the Reno area based upon my training and experience. MORA agreed that ROSSALL could pay for the remaining balance the following day. ROSSALL asked that the methamphetamine be in "rock" form, which, I believe, refers to crystalline shards of methamphetamine. MORA and ROSSALL agreed to meet near MORA's apartment at the intersection of Grove Street and Orange Street in Reno, Nevada.

134. At approximately 10:44 p.m., investigators observed MORA standing on Orange Street, across from his apartment. Investigators observed the black Crown Victoria bearing Nevada plates 261A97, travel on Grove Street towards MORA. Investigators briefly lost sight of MORA and the Crown Victoria but believe the discussed methamphetamine purchase took place near the intersection of Grove Street and Orange Street, as the black Crown Victoria was thereafter observed departing the area.

135. At approximately 10:56 p.m., the black Crown Victoria arrived at the 747 Willow St. #6 and parked across the street from the residence. Investigators observed two white males exit the Crown Victoria and positively identified one of the occupants of the Crown Victoria as Richard ROSSALL. ROSSALL was dressed in blue jeans, with a white tank

top, and wore a white do-rag  ROSSALL was carrying a clipboard in his left hand and a

bundle in his right hand. ROSSALL walked to the residence at 747 Willow Street.

   t. CIARA Hernandez and Marcos HERNANDEZ, a/k/a Bigotes,
    Pick Up Drugs in Simi Valley, CA, for Jose MORA on May 19, 2018

136. On May 18, 2018, at 9:37 p.m., Marcos HERNANDEZ ("HERNANDEZ") made a call

using (775) 400-7981 to MORA at TT-1.  MORA asked HERNANDEZ if he's ready for

tomorrow.  HERNANDEZ asked what time.  MORA tells him whenever HERNANDEZ

wants, but if he is there tomorrow after 8:00, he doesn't have to wait long.  MORA added

that the sooner the better because he doesn't have any [referring to narcotics, I believe,

based upon my training and experience and work on this investigation].  HERNANDEZ

said he needs to pick up his wife, he'll see if he can leave tonight.  MORA asked

HERNANDEZ to let him know so he can get that [possibly money] ready.

HERNANDEZ told MORA to be ready and asked what car he's taking.  MORA said the

same one [referring, I believe based upon the prior trip, to the gold Dodge Nitro].

HERNANDEZ said okay.

137. On May 19, 2018, at 1:21 p.m., MORA using TT-1 texted HERNANDEZ's other cell

phone assigned call number (775) 507-1076 an address in Simi Valley, California.  At

1:22 p.m., MORA called HERNANDEZ's phone assigned call number (775) 400-7981

and CIARA Hernandez (hereinafter, "CIARA," to avoid confusion with Marcos

Hernandez) answered.  MORA asked CIARA if the text went through.  CIARA asked for

the address and MORA asked if she had something to write with.  HERNANDEZ then

spoke with MORA on the phone and MORA said he sent the address to HERNANDEZ's

cell phone.

138. On May 19, 2018 at 2:29 p.m., MORA asked HERNANDEZ if they are at Smart and Final. CIARA took the phone and MORA asked CIARA if they are at Smart and Final. CIARA said they are by the 99 cent store and the Planet Fitness. MORA asked CIARA if they are at the address he sent. CIARA said MORA didn't send an address. MORA said he sent it to HERNANDEZ's phone. HERNANDEZ took the phone and told MORA he is at the same place as last time. MORA said he sent the address to the phone. MORA said to have the girl (CIARA) write it down. MORA then gave CIARA the address. CIARA confirmed that she got the address.

139. On May 19, 2018 at 2:54 p.m., MORA called HERNANDEZ and asked if HERNANDEZ got the message with the address. MORA asked how HERNANDEZ shows up in Facebook Messenger. HERNANDEZ answered "Antonio Hernandez." MORA asked if HERNANDEZ has Messenger, which I believe is a reference to Facebook Messenger based upon my work in this investigation, and HERNANDEZ said no. MORA provided a Simi Valley address to HERNANDEZ. CIARA picked up the phone and confirmed the same address in English.

140. On May 19, 2018, at approximately 3:30 p.m., Simi Valley Police Department Officer Christopher Mulligan conducted a traffic stop on the gold Dodge Nitro bearing Nevada license plate 479D67. The driver of the Dodge Nitro identified himself as Marcos Antonio Hernandez-Cisneros by his Nevada driver's license (HERNANDEZ). The passenger identified herself as Sierra Hernandez, date of birth November 20, 1999, and provided her residence as 175 Grove Street, Reno, NV 89506 (CIARA). Officer Mulligan provided a warning to HERNANDEZ for multiple traffic violations.

141. On May 19, 2018, at approximately 6:26 p.m., HERNANDEZ informed MORA in an intercepted communication over TT-1 that he was stopped by the police because the plate

45

on the Nitro was hanging with only one screw, but everything is fine and he'll fix that when he stops to get gas. MORA told HERNANDEZ to be careful. HERNANDEZ said he's going to take his time and will call MORA when he's close. MORA agreed.

142. On May 20, 2018, at 8:03 a.m., Marcos HERNANDEZ called MORA at TT-1 and said he was in Sacramento and talked about some problems with the transmission of the vehicle. HERNANDEZ said everything is fine and talks about sleeping last night because he was so tired. HERNANDEZ said he arrived in Sacramento at 1:00 and talked about an accident he saw coming out of Bakersfield. HERNANDEZ said there have been no problems and he'll bet at MORA's soon.

143. At 11:00 a.m. that same day, investigators observed the gold Dodge Nitro arrive at 460 East Grove, Reno, Nevada. On May 20, 2018, at 11:01 a.m., HERNANDEZ called MORA at TT-1 and said he was downstairs. MORA said he is not there [at MORA's residence, I believe], and that he was with the family. MORA asked where the truck is [a reference to the Nitro, I believe]. HERNANDEZ responded that the truck is at his (HERNANDEZ's) house. MORA told HERNANDEZ to leave the vehicle at HERNANDEZ's house with the keys under the seat. HERNANDEZ responded with wouldn't it be better at Fabi's house? [Fabi is a nickname for Javier CHAVEZ.] MORA said "whatever you want" to HERNANDEZ.

144. At 11:03 a.m., investigators observed HERNANDEZ depart 460 East Grove, the residence of MORA, and drive directly to 2725 Kietzke Lane and stop in the vicinity of trailer 12A. At 11:07 a.m., investigators observed the gold Dodge Nitro parked at trailer 12A.

145. At 11:44 a.m., investigators observed MORA and two females arrive at the trailer park located at 2725 Kietzke Lane in MORA's black Dodge Charger, bearing Nevada license plate 225B71, and park the Charger in the vicinity of trailer 12A, near the Dodge Nitro.

146. At 12:02 p.m., Jose MORA, using TT-1, called Javier CHAVEZ ("CHAVEZ") at (775) 722-2372 and MORA asked where CHAVEZ was. CHAVEZ said he is at home [believed to be 2725 Kietzke Lane #10A] and MORA said he left the truck outside and for CHAVEZ to keep an eye on it. CHAVEZ asked if he means the white one [believed to be a reference to an Isuzu pickup] and MORA says no, the Nitro. CHAVEZ asked if he (MORA) is going to try what arrived. MORA said not yet, adding that he is taking his girls to the mall for something and to just keep an eye on it [the Dodge Nitro].

147. I believed, based on the foregoing, that HERNANDEZ and CIARA returned to Reno, Nevada, from California with a supply of drugs for MORA in MORA's Dodge Nitro, and that CHAVEZ kept an eye on the Nitro which CHAVEZ knew had drugs in it, as CHAVEZ asked MORA if he was going to try what had arrived.

u.   CIARA Hernandez's and Marcos HERNANDEZ's trip to California, and arrests on May 28, 2018, with over 6 pounds of methamphetamine

148. I hereby incorporate, as if fully set forth herein, paragraphs 157-163 below regarding the seizure of over 6 pounds of methamphetamine from HERNANDEZ and CIARA, who were borrowing MORA's vehicle, to transport methamphetamine from California to Reno, Nevada, as it is an event that is part of and in furtherance of this conspiracy.

v.   Drug Calls between MORA and Nyra Navarro-ORTIZ reflecting knowledge of the seized drugs destined for MORA

149. On May 28, 2018, at 8:40 p.m., MORA using TT-2 made an outgoing telephone call to Javier CHAVEZ's phone with call number (775) 722-2372. Mora said that he is not

going out because of that [referring, I believe, to Marcos HERNANDEZ's arrest, as referenced below]. Nyra Navarro-ORTIZ ("ORTIZ") came to the phone to tell MORA that he (an unknown male) will give MORA the key tomorrow and that she doesn't want MORA to park by her house. MORA asked why ORTIZ doesn't want MORA to park by her house and she said because he (HERNANDEZ) was driving MORA's truck and that's not good. ORTIZ asked MORA if it's bad for MORA because he's on parole. MORA said no because he wasn't driving and he wasn't there. ORTIZ stated that she knows MORA could say what he said last time, that he let them borrow the truck because they're his family. ORTIZ asked if they (police) arrested him (HERNANDEZ) today. MORA says he doesn't want to talk about that right now. HERNANDEZ advised MORA to stop doing that. MORA said he doesn't care what ORTIZ says, he's going over there tomorrow. ORTIZ reminded Mora that she won't let him park there (at her house).

150. Based on my training and experience, the training and experience of other agents with whom I have consulted, my knowledge of this investigation, corroborating surveillance, and these intercepted conversations, I believe that ORTIZ knew of MORA's involvement in the drug shipment that was seized from MORA's gold Dodge Nitro earlier in the day on May 28, 2018, leading to the arrest of Marcos HERNANDEZ and CIARA Hernandez. Because MORA's Nitro was used to transport the drugs, ORTIZ told MORA not to park by her house, 2725 Kietzke Lane, #10A, to avoid drawing attention of law enforcement.

    w.    May 29, 2018, Methamphetamine Transaction between
                  Jose MORA and Marco Antonio RAMIREZ for a third person

151. On May 29, 2018, beginning at approximately 8:37 p.m., Marco Antonio RAMIREZ (hereinafter, "RAMIREZ") using (775) 412-1142 sent a text message to MORA at TT-1 asking for "the blue one." RAMIREZ mentions that "it is for the guy to see if he likes it." This communication reveals an established relationship, in that RAMIREZ refers to

"the guy" that "the blue one" is for, which MORA would only understand through prior

contact with RAMIREZ.  In addition, RAMIREZ used the term "blue one" in his text

message to MORA, without any confusion or need for explanation.  In addition,

RAMIREZ did not have to identify himself in these text messages to MORA.

152.  Thereafter, that same day, at 9:04 p.m., RAMIREZ sent a message to MORA at TT-1

saying he was on Lewis Street.  RAMIREZ did not provide a specific address on Lewis,

yet MORA, based upon intercepted communications and corroborating surveillance

expressed no confusion as to the meeting place with RAMIREZ, further reflecting an

ongoing relationship between the two involving drugs.

153. Consistent with the intercepted communications reflected above, at 9:06 p.m.,

investigators observed a white sedan Special Edition Honda Accord, bearing Nevada

license plate NRJ822, travel west in the 1500 block of Lewis Street.  The the vehicle

turned into 1590 Lewis Street, reversed into Lewis Street and parked.  MORA walked to

the white sedan Honda Accord from his black Dodge Charger, opened a passenger door,

and stood in the open doorway.

154. This Special Edition Honda Accord is registered to Marciano Ramirez, the father of

RAMIREZ.  The phone used to contact MORA was the same phone number RAMIREZ

listed during his last arrest and also the phone number he has listed on his Facebook page.

155. In addition, on May 29, 2018, MORA in intercepted communications over TT-1, told

some of his contacts, including to quit using messenger (e.g., "don't text me on

messenger no more"), which I believe is a reference to Facebook Messenger.  MORA's

instruction not to use "messenger" was one day after Washoe County Sheriff's Office

deputies seized over 6 pounds of methamphetamine from HERNANDEZ and CIARA

who were traveling to Reno from California in MORA's Dodge Nitro, as set forth below

in relation to Count Six. I believe RAMIREZ was one of MORA's contacts who received that message, as the communications intercepted over TT-1 on May 29, 2018, reflected an ongoing drug trafficking relationship between RAMIREZ and MORA, as explained above.

156. Based on my training and experience, the experience of other investigators with whom I have consulted, my knowledge of this investigation to date, and the context of these calls with each other during this series of calls and in connection with corresponding surveillance, I believe MORA sold RAMIREZ methamphetamine ("blue") that RAMIREZ was going to provide to another person. In the exchanged text messages, RAMIREZ openly discussed providing the methamphetamine he purchased from MORA for another individual.

### *Count Six:*

***Possession with Intent to Distribute at least 500 Grams of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, on May 28, 2018, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii)***

***As to Defendants***
***Jose Mora,***
***Marcos Hernandez a/k/a Bigotes, and***
***Ciara Hernandez***

157. Beginning on May 26, 2018, multiple communications were intercepted over TT-1 between Jose MORA ("MORA") and Marcos HERNANDEZ, a/k/a Bigotes ("HERNANDEZ") using (775) 400-7981. At approximately 10:11 a.m. that day, MORA made an outgoing call to HERNANDEZ. MORA told HERNANDEZ he is having breakfast. MORA added that his buddy said yes, and for HERNANDEZ to go by. HERNANDEZ said he will go, but he has to finish up there. MORA says to try and go as soon as possible. HERNANDEZ says he will try.

158. At approximately 9:53 p.m. on May 26, 2018, HERNANDEZ made a call to MORA and MORA asked HERNANDEZ if he was almost there. HERNANDEZ informed MORA that he was already in Los Angeles. MORA said he will send HERNANDEZ the address. HERNANDEZ said okay. At approximately 9:57 p.m., MORA sent a text message to HERNANDEZ, providing an address in the greater area of Los Angeles. At approximately 10:28 p.m., MORA made an outgoing call to HERNANDEZ and asked HERNANDEZ if he got the text MORA sent him. HERNANDEZ affirmed, and said that he was 13 miles away from the place. MORA said that he will call [an unknown individual] to let him know that HERNANDEZ was almost there.

159. At 10:48 p.m. on May 26, 2018, MORA sent an outgoing text to HERNANDEZ's phone, writing, "U guys are still like 45 min away right?" An immediate text message from HERNANDEZ's phone read, "Yea we are close." MORA quickly responded via text message in English, "That's why I tell bigotes...to get there at certain times" and then added, "This guys are busy and cannot stay for long." At 10:56 p.m., MORA wrote a text message to HERNANDEZ phone, stating, "Tell bigotes....they left" and then added, "They b back in the morning."

160. At approximately 10:17 p.m. on May 27, 2018, MORA sent a text message to HERNANDEZ telling HERNANDEZ to be careful.

161. On May 28, 2018, at approximately 2:40 a.m., Washoe County Sheriff Office deputies observed a gold Dodge Nitro, Nevada license plate 250E75, driving eastbound on I-80. A DMV query revealed that this vehicle is registered to Jose Mora. Washoe County deputies stopped the Dodge Nitro ("Nitro") for Failure to Maintain Lane. The driver of the vehicle identified himself as Marcos HERNANDEZ-Cisneros and the passenger was identified as CIARA Hernandez. Deputies noted an odor of marijuana coming from the

Nitro. HERNANDEZ displayed signs and symptoms of narcotics use. Deputy David Dunham and K9 Kyago have been and are certified by Nevada POST as a narcotic detection team. Deputy Dunham deployed K9 Kyago, who is trained and certified in the detection of the odor of controlled substances, on the exterior of the Dodge Nitro. K9 Kyago gave Deputy Dunham a positive alert to the odor of a controlled substance coming from the vehicle. Deputies conducted a search of the Dodge Nitro and located five black cylinders wrapped in black tape in the rear of the vehicle. Inside the black cylinders, deputies located a white crystalline substance consistent with methamphetamine, a schedule II controlled substance. Both Marcos HERNANDEZ and CIARA Hernandez were arrested and transported to the Washoe County Detention Facility. The suspected methamphetamine was booked into evidence with a gross weight (including packaging) of 2,851 grams. The suspected methamphetamine evidence was field-tested, the result of revealing the presence of methamphetamine.

162. Based on my training and experience, the training and experience of other agents with whom I have consulted, my knowledge of this investigation, corroborating surveillance, intercepted communications, and the search, I believe that HERNANDEZ and CIARA picked up and returned to Nevada with methamphetamine for MORA. I believe that MORA coordinated with methamphetamine source(s) of supply in California to meet with HERNANDEZ and CIARA at the address provided by MORA via text message, where HERNANDEZ and CIARA took possession of the methamphetamine with the intent to transport the methamphetamine to MORA in Reno, Nevada, which was intercepted by Washoe County Sheriff Office deputies.

# VI.

## CONCLUSION

163. Based upon the foregoing, I submit there is probable cause that each of the Defendants have committed one or more of the Target Offenses, in the District of Nevada, and possibly elsewhere, and, accordingly, I respectfully request the issuance of an arrest warrant for each of the Defendants accordingly.

164. I also respectfully request that this affidavit, and the corresponding complaint and arrest warrants, be sealed until the last defendant named in this complaint is arrested by law enforcement, and, at that time, this affidavit and complaint will be deemed unsealed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Special Agent Scott Dunn
Federal Bureau of Investigation

Sworn to before me this 13th day of June, 2018.

HON. VALERIE P. COOKE
UNITED STATES MAGISTRATE JUDGE